1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10    VIET KIM LE,

11              Petitioner,              No. CIV S-06-CV-0201 KJM CHS P

12        vs.

13    RICHARD KIRKLAND,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15    _____/

16                            **I.  INTRODUCTION**

17            Petitioner, Viet Kim Le, is a state prisoner proceeding by counsel with a petition for

18    writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of life

19    plus seven years without the possibility of parole after his conviction by jury trial in the Sacramento

20    County Superior Court, for the murder of Melinda Vo and the attempted murder of Thanh La, with

21    a penalty enhancement on each of the above charges for personal use of a firearm.  The jury also

22    found true a special circumstance for discharging a firearm from a motor vehicle with the intent to

23    inflict death.  Here, Petitioner challenges the constitutionality of his convictions.

24                            **II.  CLAIMS**

25            Petitioner presents several grounds for relief.  Specifically, the claims are as follow,

26    verbatim:

                                         1

(1)     Petitioner was deprived of the effective assistance of counsel by counsel's failure to investigate and expose the physical impossibility of Thanh La's identification of Petitioner as the driver of the car chasing him through the Kelley Drive intersection.

(2)     Petitioner was deprived of effective assistance of counsel and due process of law by the combination of defense counsel's failure to investigate and present evidence of Thanh La's motive to falsely incriminate Petitioner, and the prosecutor's failure to disclose and acknowledge evidence of Thanh La's bias.

(3)     Petitioner was deprived of due process and a fair trial by the court's erroneous admission of evidence of Petitioners' purported gang membership and a generic "rivalry" between a group of gangs with which Petitioner was affiliated and a group of gangs with which Thanh La was affiliated.

Petitioner's ineffective assistance of counsel claims, set forth in his first and second grounds for relief, will be addressed cumulatively in section (V)(A), below.  To the extent that the remainder of Petitioner's second ground for relief alleges a separate prosecutorial misconduct claim, it will discussed in section (V)(B).  Petitioner's final claim alleging that the trial court improperly admitted gang evidence will be addressed in section (V)(C).  Based on a thorough review of the record and applicable law, it is recommended that each of Petitioner's claims be denied.

## III. BACKGROUND

**A. FACTS**[1]

The basic facts of Petitioner's crime were summarized in the unpublished opinion of the California Court of Appeal, Third Appellate District, as follow:

[Thanh La] was born in Vietnam and came to the United States when

---

[1] There are three main parties relevant to this case.  Melinda Vo ("Melinda") was shot and killed while driving a car being pursued by a car driven by Petitioner.  Melinda was Thanh La's ("Thanh") girlfriend at the time she was killed, and Thanh was a passenger in the vehicle driven by Melinda.  Viet Kim Le ("Viet" or "Petitioner") was accused of driving a vehicle in a high speed chase after Melinda and Thanh, and ultimately firing multiple gunshots into their car, killing Melinda.  There was evidence that Viet and Melinda were involved in a short romantic relationship several years prior to the shooting.  There was also evidence that Viet and Thanh were members of rival gangs in the Stockton area.  Thanh, who was on parole at the time of the shooting, denied that he was a gang member when he testified at trial.

2

he was 10 or 11. [Thanh] met [Melinda Vo] at a Vietnamese New Year celebration; they dated off and on for a year. At the time [of the shooting], [Thanh] was on parole and living with his parents.

Late one night in June 1997, [Melinda] and [Thanh] were coming back from a drive to the river in Stockton. On the way to the river, [Thanh] had bought a six-pack of beer and had drunk half of it. Since [Thanh] did not want to drive after drinking, [Melinda] was driving on the way back.

While [Melinda] and [Thanh] were driving around the neighborhood, [Thanh] noticed a car following behind them on Kelley Drive near the Kelley Drive-Hammer Lane intersection. [Thanh] heard the car following, turn around, and recognized a person whom he know as "Viet" ([Petitioner]'s first name) as the driver of the car. In the passenger seat was a person whom [Thanh] did not recognize, but who he could tell was Asian. [Thanh] also believed that there were others in the car, but he could not see anyone in the back seat because the back window was tinted.

[Petitioner]'s car followed [Thanh]'s car closely, almost bumper-to-bumper, for a few minutes. Although [Thanh] and [Melinda] were about a half-mile from [Thanh]'s parents' house, [Thanh] did not want to go there because he was afraid that [Petitioner] and his companions would do something to his family. Accordingly, [Thanh] told [Melinda] to get onto the freeway, and she did, turning from Kelley Drive onto Hammer Lane and getting onto the freeway headed toward Sacramento.

On the ramp to the freeway, [Thanh] ducked down so that [Petitioner] could not see him. [Melinda] and [Thanh] thought that [Petitioner] might not have seen [Thanh] and might let them go. Still, [Thanh] was concerned that [Petitioner] and his companions might do something to him.

[Petitioner]'s car followed [Thanh] and [Melinda] onto the freeway. [Thanh] and [Melinda] were going about 80 to 90 miles an hour. [Petitioner]'s car was about one car-length behind. On three or four occasions, [Petitioner]'s car pulled up on the passenger side of [Thanh] and [Melinda]'s car. Although [Thanh] remained ducked down, he would sit up and look off and on. When he did, he had a better view of whether there were others in [Petitioner]'s car. [Thanh] could see the person sitting on the passenger side of the pursuing car, but could not tell whether there were others in the back because of the tinted windows. And [Thanh] could not identify anyone but [Petitioner], because he did not recognize the man in the passenger seat.

[Thanh] and [Melinda] got off the freeway at an exit where there was a gas station. [Thanh] thought that there might be people to help. But [Melinda] went through the stop sign at the end of the off ramp

and got back onto the freeway. [Petitioner]'s car followed them off and back onto the freeway. [Melinda] said that they should keep on driving until they saw another car and wave for help. But there were no other cars that night.

Finally, [Petitioner]'s car pulled alongside; [Thanh] heard gunshots. [Thanh] had remained ducked down and did not see [Petitioner] or anybody with a gun. But he heard five or six gunshots, some louder than others, for a few seconds. His car then went over to the other side of the road and off the road into a farm field where it stopped. [Thanh] was all right and checked [Melinda]. She did not answer. He tried giving her mouth-to-mouth resuscitation for about 10 minutes, but she did not respond. [Thanh] ran to the freeway to get some help.

[Thanh] eventually was able to flag down a woman motorist, who, in turn, flagged down a trucker, who called 911. California Highway Patrol officers, who responded to the call, found bullet holes in the car and [Melinda] unconscious and without a pulse.

A Sacramento County Sheriff's deputy who arrived shortly thereafter questioned [Thanh]. [Thanh] told him that he did not recognize anyone in the car, did not know who they were, and did not recognize the other car.

But later that day, [Thanh] went to the Sheriff's Department and was shown a photographic lineup. [Thanh] picked out [Petitioner]'s photograph. And [Thanh] told investigating officers that [Petitioner] was [Melinda]'s boyfriend, that he knew [Petitioner] independently from the Stockton area, and that he saw [Petitioner] driving the car but did not see a gun.

Some days later local news media were reporting that [Petitioner] was a suspect in the shooting. [Petitioner] disappeared for almost four years, but in April 2001 turned himself in to the police.

(Lodged Doc. 5 at 2-6).

Following a jury trial, Petitioner was convicted of murder and attempted murder with penalty enhancements on each charge for personal use of a firearm. He was sentenced to life imprisonment without the possibility of parole on the murder charge, plus one additional year for use of a firearm. In addition, Petitioner was sentenced to a consecutive term of seven years on the attempted murder charge, plus one additional year for use of a firearm.

Petitioner appealed his convictions to the California Court of Appeal, Third Appellate District. In addition, he filed a concurrent petition for writ of habeas corpus in the appellate court,

requesting that it be consolidated with his direct appeal.  The appellate court denied the habeas corpus petition without comment on October 9, 2003, and denied Petitioner's appeal with a reasoned opinion on October 29, 2003.  He then filed a petition for review of the appellate court's denial of his habeas corpus petition and a separate petition for review of the appellate court's denial of his appeal in the California Supreme Court, again requesting that the petitions be consolidated.  Both of the petitions were denied without comment on December 23, 2003 and January 14, 2004, respectively.  Petitioner next filed an original petition for writ of habeas corpus in the California Supreme Court.  The petition was denied without comment on February 2, 2005

Petitioner filed this federal petition for writ of habeas corpus on January 30, 2006.  Respondent filed its answer on April 11, 2006.  Petitioner did not file a traverse.

## IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000).  Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Although "AEDPA does not require a federal habeas court to adopt any one methodology," *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), there are certain principles which guide its application.

First, AEDPA establishes a "highly deferential standard for evaluating state-court rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Accordingly, when determining whether the law applied to a particular claim by a state court was contrary to or an unreasonable application of "clearly established federal law," a federal court must review the last reasoned state court decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Provided that the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief. *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232 F.3d 1031, 1035 (9th Cir. 2000). Conversely, when it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential standard does not apply and a federal court must review the claim *de novo*. *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381). In other words, "clearly established Federal law" will be " the governing legal principle or principles set forth by [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64. It is appropriate, however, to examine lower court decisions when determining what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal court may grant a writ of habeas corpus only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405. It is not necessary for the state court to cite or even to be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision

1  contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  Moreover, a state court opinion need not

2  contain "a formulary statement" of federal law, but the fair import of its conclusion must be

3  consistent with federal law.  *Id*.

4          Under the "unreasonable application" clause, the court may grant relief "if the state

5  court correctly identifies the governing legal principle...but unreasonably applies it to the facts of

6  the particular case." *Bell*, 535 U.S. at 694.  As the Supreme Court has emphasized, a court may not

7  issue the writ "simply because that court concludes in its independent judgment that the relevant

8  state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*,

9  529 U.S. at 410.  Thus, the focus is on "whether the state court's application of clearly established

10 federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

11         Finally, the petitioner bears the burden of demonstrating that the state court's

12 decision was either contrary to or an unreasonable application of federal law. *Woodford*, 537 U.S.

13 at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

## V.  DISCUSSION

**A.    Effective Assistance of Counsel**

16         Petitioner claims that trial counsel rendered prejudicially ineffective assistance by

17 1) failing to investigate and expose the physical impossibility of Thanh La's identification of him

18 as the driver of the car chasing him through the Kelley Drive intersection and 2) failing to

19 investigate and present evidence of Thanh La's motive to falsely incriminate him.

20         The Sixth Amendment to the United States Constitution guarantees to a criminal

21 defendant the effective assistance of counsel.  The United States Supreme Court set forth the test

22 for determining whether counsel's assistance was ineffective in *Strickland v. Washington*, 466 U.S.

23 668 (1984).  To support a claim that counsel's performance was ineffective, a petitioner must first

24 show that, considering all the circumstances, counsel's performance fell below an objective standard

25 of reasonableness.  *Id.* at 687-88.  After a petitioner identifies the acts or omissions that are alleged

26 not to have been the result of reasonable professional judgment, the court must determine whether,

in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance. *Id.* at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id. See also Williams v. Taylor*, 529 U.S. 362, 391-92 (2000); *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 697). In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). In addition, there is a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689). Thus, a reasonable tactical decision by counsel with which the defendant disagrees cannot form the basis of an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 689. The court does not consider whether another lawyer with the benefit of hindsight would have acted differently than trial counsel. *Id.* Instead, the court considers whether counsel made errors so serious that counsel failed to function as guaranteed by the Sixth Amendment. *Id.* at 687.

In this case, both of Petitioner's ineffective assistance claims allege that trial counsel's performance was deficient based on a failure to investigate. Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "This includes a duty to . . . investigate

and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999). In this regard, it has been recognized that "the adversarial process will not function normally unless the defense team has done a proper investigation." *Siripongs v. Calderon*, 133 F.3d 732, 734 (9th Cir. 1998) (citing *Kimmelman*, 477 U.S. at 384). Therefore, counsel must, "at minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." *Hendricks v. Calderon*, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal quotations omitted)). On the other hand, where an attorney has consciously decided not to conduct further investigation because of reasonable tactical decisions, his or her performance is not constitutionally deficient. *See Siripongs*, 133 F.3d at 734; *Babbitt v. Calderon*, 15 F.3d 1170, 1173 (9th Cir. 1998); *Hensley v. Crist*, 67 F.3d 181, 185 (9th Cir. 1995). "A decision not to investigate thus 'must be directly assessed for reasonableness in all circumstances.'" *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 691). *See also Kimmelman*, 477 U.S. at 385 (counsel "neither investigated, nor made a reasonable decision not to investigate"); *Babbitt*, 151 F.3d at 1173-74. A reviewing court must "examine the reasonableness of counsel's conduct 'as of the time of counsel's conduct.'" *United States v. Chambers*, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting *Strickland*, 466 U.S. at 690). Moreover, "'ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.'" *Bragg*, 242 F.3d at 1088 (quoting *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986)).

### 1.      Thanh La's Identification of Petitioner

Petitioner claims that trial counsel rendered prejudicially ineffective assistance by failing to investigate and expose the physical impossibility of Thanh La's identification of Petitioner as the driver of the vehicle chasing him through the Kelley Drive intersection. The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on direct appeal,

explaining the background of the claim and its reasoning as follows:

### A. Background

On cross-examination at trial, defense counsel had elicited testimony from [Thanh] that when the car started chasing [Thanh] and [Melinda], it was one length back and its headlights were on. [Thanh] testified that he turned around, looked out the back window of the car, and saw two headlights shining right into his car. [Thanh] testified that at that point he saw [Petitioner]'s face in the pursuing car.

The claimed deficiency in trial counsel's performance in this case was first raised in [Petitioner]'s motion for new trial filed by his new counsel, who stated in a declaration that he found implausible [Thanh]'s testimony that [Thanh] identified [Petitioner] while being chased and "staring back into the [pursuing] car's headlights."

[Petitioner]'s new counsel also stated in his declaration that he experimented with looking at the driver behind him at night but saw only "headlights glaring into my eyes."  Accordingly, counsel retained an expert, Dr. Alan Flach, who went to the intersection in Stockton where [Thanh] testified he first saw [Petitioner], on an evening when weather conditions were similar to those on the night of the shooting (i.e., a full moon).

Dr. Flach, a board-certified ophthalmologist, stated in his declaration in support of the new trial motion that based on his training and experience, the relatively powerful light from headlights would interfere with a witness's ability to see individuals in the immediate vicinity.  Dr. Flach also stated that he agreed to participate in an experiment to test the effect of headlights on "the visual pigments" of a person in [Thanh]'s position, who looked back into the headlights of a pursuing car.  According to Dr. Flach, it would be difficult for a witness to identify an individual, who was in a pursuing car, given that the witness's eyes would be "photo-stressed by the headlights" of that car.  Dr. Flach explained that there is a phenomenon reported in medical literature regarding the immediate decrease in visual acuity and capacity from exposure to a bright light, because of the bleaching of photo pigment cells of the retina and the amount of time that it takes for the cells to return to normal capacity. Dr. Flach believed that a reenactment would demonstrate whether this process could have interfered with [Thanh]'s identification.

However, Dr. Flach concluded in his declaration that after conducting the reenactment, his original theory was "largely irrelevant," because the "level of illumination in the pursuing vehicle was so low that no identification was possible by any individual in the escaping car." According to Dr. Flach, there was enough ambient light from streetlights and business signs for a vehicle passenger to see buildings, other cars, and pedestrians, but not enough to penetrate

10

inside a vehicle. He explained that there were "no sources of lateral illumination at the level of the car windows shining sideways into the pursuing car to illuminate the face or features of the person in the pursuing car." And Dr. Flach added that because of the reflection of light from the overhead streetlights on the roof of the car, there would be less illumination within the vehicle as compared to the outside. Dr. Flach also noted that pupils dilated to adjust to the low level of ambient light are less able to identify objects or features upon looking into bright headlights.

Based on the reenactment, Dr. Flach concluded: "[T]he witness's description of the identification of a person's facial features in the rear car is physiologically impossible, given the low available level of illumination."

[Petitioner] also supported his new trial motion with a declaration from his former trial counsel, who stated simply: "I did not conduct any investigation of the lighting conditions in the vicinity of the Kelly [sic] Drive/Hammer Lane intersection of on the I-5 freeway where the chase and shooting occurred."[FN2]

> FN2.   A declaration from defense counsel's investigator was to the same effect.

## B. Analysis

To challenge a judgment based on ineffective assistance of counsel, [Petitioner] must demonstrate that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 690-691, 694 [80 L.Ed.2d 674, 695, 698]; *In re Cudjo* (1999) 20 Cal.4th 673, 687 (*Cudjo*); *People v. Hart* (1999) 20 Cal.4th 546, 623-624 (*Hart*).) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*Hart*, *supra*, 20 Cal.4th at p. 624, quoting *Strickland v. Washington*, *supra*, 466 U.S. at p. 694 [80 L.Ed.2d at p. 698].)

In providing effective assistance of counsel, defense counsel has a duty to make reasonable investigations or to make a reasonable decision that a particular investigation is not necessary. (See *Strickland v. Washington*, *supra*, 466 U.S. at pp. 690-691 [80 L.Ed.2d at pp. 695-696]; *Cudjo*, *Supra*, 20 Cal. 4th at p. 692; *In re Jones* (1996) 13 Cal.4th 552, 565; *In re Cordero* (1988) 46 Cal. 3d 161, 180.) "'In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" (*Cudjo*, *supra*, 20 Cal.4th at p. 692, quoting *Strickland v. Washington*, *supra*, 466 U.S. at p. 691 [80 L.Ed.2d at p. 695].)

11

But our Supreme Court has long held: "'To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." [Citation.]'" (*Hart, supra,* 20 Cal.4th at pp.623-624, quoting *People v. Pope* (1979) 23 Cal.3d 412, 426, fn. omitted; see also *People v. Adkins* (2002) 103 Cal.App. 4th 942, 950-951.) Accordingly, appellate courts reverse convictions for ineffective assistance of counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for the claimed incompetent act or omission. (See *People v. Milner* (1988) 45 Cal.3d 227, 238; *People v. Fosselman* (1983) 33 Cal.3d 572, 581; *People v. Adkins, supra,* 103 Cal.App.4th at p. 951.)

In this case, trial counsel acknowledged that he had failed to investigate the lighting conditions at the Kelley/Hammer Lane intersection or on the I-5 freeway, but was notably silent in his declaration on whether he had an explanation for that failure. Because we apply a heavy measure of deference to counsel's judgments and the record suggests rational tactical reasons for a decision not to pursue an investigation of the lighting conditions, we decline to reverse the judgment on the bases of the record before us.

First, trial counsel could have reasonably concluded that its most powerful impeachment of [Thanh]'s identification of [Petitioner] was [Thanh]'s testimony on cross-examination that the headlights from [Petitioner]'s car were shining directly into his eyes at the time of his nighttime identification. Jurors could understand this phenomenon without an expert's opinion, which, if impeached or tenuous, could undermine the impact of [Thanh]'s admission. Defense counsel could have concluded that [Thanh]'s testimony, combined with the fact that [Thanh] originally told police that he did not see anyone, was his most effective impeachment of [Thanh]'s identification. As a result, a reasonable attorney could determine that an investigation would at best lead to the retention of an expert whose testimony only held the risk of undermining, through impeachment, the doubt concerning identification that may have been established from the examination of the eyewitness.

Second, Dr. Flach's theory boiled down to there being "no sources of lateral illumination" to illuminate the face of persons in the pursuing car, but trial counsel might have concluded that sophisticated theories of the difficulty of seeing [Petitioner] in a pursuing car might have simply given the prosecution an opportunity to emphasize how well lit the street was. Indeed, on redirect examination, [Thanh] testified that Hammer Lane was a "well-lit street" with "[l]ots of lighting on both sides of the road."

Third, the strength of [Thanh]'s identification of [Petitioner] ultimately was a function of the jury's assessment of [Thanh]'s credibility as a witness. Reasonable counsel could have concluded

that [Petitioner]'s defense should focus on [Thanh]'s trustworthiness (e.g., inconsistent statements of what he saw) as opposed to expert testimony of lateral illuminations that raised some risks and was ultimately secondary to the determination of [Thanh]'s veracity.

Based on the record, we cannot say that there can be no satisfactory explanation for defense counsel's failure to investigate the lighting conditions at the time of [Thanh]'s identification of [Petitioner]. (See *Hart, supra,* 20 Cal.4th at p. 632.)

In any event, [Petitioner] has failed to demonstrate a reasonable probability that but for defense counsel's failure to investigate the lighting conditions, the trial would have resulted in a more favorable outcome. (*Cudjo, supra,* 20 Cal.4th at p. 687.)

To the contrary, there was other evidence, besides [Thanh]'s identification, which placed [Petitioner] in the car from which the shots were fired that killed [Melinda]. First, [Melinda] identified [Petitioner] - - hearsay evidence that came in without a defense objection (but rather at the defense's instance [sic]) and which could be considered by the trier of fact.[FN3] (Cal. Law Revision Com. com. [sic], 29B pt. 1 West's Ann. Evid. Code (1995 ed.) foll. § 140, p.15; 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, §§ 393-394, pp. 484-485.) Specifically, defense counsel cross-examined [Thanh] on the theory that [Thanh] never saw [Petitioner], but only heard from [Melinda] that [Petitioner] was driving the car. And [Thanh] suggested as much in his interview at the Sheriff's Department on the day of the shooting. But [Thanh] explained that he had seen [Petitioner] first and then [Melinda] told him she saw [Petitioner], her ex-boyfriend.

> FN3. The prosecution did not attempt to introduce this hearsay evidence directly. To the contrary, the prosecutor elicited testimony on direct [examination] that [Thanh] noticed [Petitioner] because [Thanh] heard the pursuing car, not because of anything [Melinda] said. Indeed, the prosecutor cautioned [Thanh] that he could not testify to anything [Melinda] said. And [Thanh] agreed that he would testify only to what he saw. But defense counsel thereafter adduced the hearsay testimony that [*Melinda*] *said* that [Petitioner] was the driver of the pursuing vehicle, presumably to impeach [Thanh]'s testimony. On appeal, [Petitioner] does not contend that counsel rendered ineffective assistance as a result of this examination. Accordingly, we do not address a point not urged upon appeal. (See *Badie v. Bank of America*, (1998) 67 Cal.App.4th 779, 784-785 [citing cases].)

Second, [Thanh] testified that during the freeway chase he put his

head up and looked at the car driven by [Petitioner] while it pulled up along his side of the car.  Observing that he was closest to the driver of [Petitioner]'s car, [Thanh] testified: "When I sneak up, I look through and I see another guy sitting on the passenger' [*sic*] side." This evidence supports a reasonable inference that [Thanh] necessarily saw [Petitioner] as he looked to see the person in the passenger seat next to [Petitioner].  The jury could also have reasonably inferred that the circumstances of viewing the driver of a car traveling alongside might be better than the view from behind, looking into the headlights.

Third, the prosecutor presented evidence that before returning to surrender after almost four years, [Petitioner] telephoned his aunt and uncle asking for $10,000 to pay for an attorney and during the call, referred to his being in trouble *because of something that happened in his car*.  A Vietnamese-speaking police officer testified that he interviewed [Petitioner]'s aunt who said that [Petitioner] had said during the telephone call that he and his friends had gotten into some kind of trouble.  [Petitioner]'s uncle joined the interview and also told the officer that he had spoken on the telephone with [Petitioner], who mentioned that he [had] gotten caught in a situation with some people in his car.  According to the officer, [Petitioner]'s aunt corrected his uncle, stating that he had learned the information from her, not [Petitioner], and that [Petitioner] and his friend were stuck in a situation.  This hearsay evidence was introduced without objection by the defense, after [Petitioner]'s aunt and uncle denied unequivocally that they made any of these statements.  (Evid. Code, §§ 770, 1235.)

Fourth, there was the evidence of [Petitioner]'s flight itself.  Evidence that a defendant flees and seeks to avoid apprehension after the commission of a crime is highly probative of his participation in the crime and his consciousness of guilt.  (See *People v. Neely* (1993) 6 Cal.4th 877, 896-897.)   Admittedly, evidence of flight is not sufficient in and of itself to establish guilt (§ 1127c), as the jury was instructed.  But here, the jury heard evidence that [Thanh] identified [Petitioner], that [Melinda] identified [Petitioner], and that [Petitioner] told his aunt and uncle that he had gotten into trouble because of something that happened in his car.  (Compare *People v. Pensinger*, (1991) 52 Cal.3d 1210, 1245.  Thus, there was other evidence.

Finally, [Thanh]'s identification of [Petitioner] is also corroborated by the fact that [Petitioner] had a motive for this unusual car chase: They were members of rival gangs.

The foregoing discussion of additional evidence that identifies [Petitioner] as the perpetrator is not exhaustive.  But in light of such evidence, [Petitioner] cannot make the requisite demonstration of prejudice owing simply to his counsel's failure to investigate the lighting conditions, particularly from an expert who changed, or appeared to change, his theory midstream.  To the contrary, there was

> a mosaic of interlocking evidence, which, when viewed as one piece, was compelling.
>
> Accordingly, [Petitioner]'s claim of ineffective assistance of counsel fails because counsel could have had tactical reasons not to investigate the lighting conditions, and [Petitioner] has failed to show a reasonable probability of a more favorable outcome but for trial counsel's failure to introduce the lighting conditions. (*Hart, supra,* 20 Cal.4th at p.632; cf. *In re Jones, supra,* 13 Cal.4th at pp. 565-566.)

(Lodged Doc. 5 at 6-16.)

The state appellate court's rejection of Petitioner's ineffective assistance of counsel claim was not contrary to or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the circumstances.  The United States Supreme Court recently emphasized that "the pivotal question" for a federal court conducting habeas corpus review under § 2254(d) "is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standards." *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential' . . . and when the two apply in tandem, review is 'doubly' so." *Id.* at 788.  The determination to be made, therefore, is not whether counsel acted reasonably but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

Here, as articulated by the state court, there is a "reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S.Ct. at 788.  Specifically, there is a reasonable argument that Petitioner's trial counsel determined that Thanh could be most effectively impeached regarding his identification of Petitioner as the driver of the car pursuing him through the Kelley Drive intersection on cross examination, and that jurors could understand the questionable reliability of an identification made at nighttime with a headlights shining directly into Thanh's eyes without expert testimony.  There is also a reasonable argument that counsel could have concluded that Thanh's identification testimony, combined with his earlier inconsistent statements to police regarding his failure to recognize either of the occupants of the pursuing vehicle was the

most effective impeachment strategy.  In addition, it is not clear that the expert opinion of Dr. Flach regarding the lighting conditions at the Kelley Drive intersection would have been useful in assisting jurors to evaluate Thanh's identification testimony.  In fact, as noted by the state court, Dr. Flach's sophisticated theories regarding the difficulty of visually identifying the occupants of a pursuing vehicle in the Kelley Drive intersection could have provided the prosecution with the opportunity to emphasize Thanh's testimony that the Kelley Drive intersection *was* well lit and provided ample illumination to make an identification of Petitioner, thus undermining Thanh's admission on cross examination that he identified Petitioner while staring directly into the headlights of the pursuing vehicle.  Counsel "was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 789.   As the United States Supreme Court has recognized there are "countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client the same way.  Rare are the situations in which the wide latitude counsel must have in making tactical decision will be limited to any one technique or approach." *Id*.  Thus, on the record in this case, it cannot be determined that the state court improperly found that trial counsel's performance did not fall below reasonable professional standards.

In any event, even assuming arguendo that counsel's performance was deficient, Petitioner has not demonstrated a reasonable probability that but for trial counsel's failure to investigate the lighting conditions, the outcome of Petitioner's trial would have been different.  As summarized above by the state court, other evidence in the record aside from the identification made by Thanh while looking directly into the headlights of the pursuing vehicle indicated Petitioner's guilt.  For example, Thanh testified that he had opportunities to look into the pursuing vehicle and observe its passengers when the vehicle pulled up directly next to his vehicle on at least one occasion.  There was also evidence in the record that the shooting was motivated by Petitioner's and Thanh's membership in rival gangs, that Petitioner knew he was a suspect in the shooting but disappeared for almost four years before surrendering himself to law enforcement officials, and that

Petitioner telephoned his aunt and uncle prior to surrendering, and told them that he was in trouble and needed an money for an attorney because of something that happened in his car.  Accordingly, there is no reasonable likelihood that a more favorable outcome would have resulted at trial absent counsel's alleged deficient performance.

Petitioner is not entitled to federal habeas corpus relief on this claim.

### 2.    Thanh La's Motive

Petitioner claims that trial counsel rendered prejudicially ineffective assistance by failing to investigate and present evidence of Thanh La's motive to falsely incriminate Petitioner as the driver of the vehicle chasing him through the Kelly Drive/Hammer Lane intersection.  The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on direct appeal, explaining the background of the claim and its reasoning as follows:

#### *A. Background*

As reported in the declaration of the defense investigator, which was filed in support of [Petitioner]'s motion for a new trial, [Thanh]'s parole officer had stated that "any involvement in gang activity would have been a violation of [Thanh's] parole conditions." [Petitioner] also supported his new trial motion with (1) a prosecution investigator's report that [Thanh] had to travel to San Francisco every six months to provide up-to-date information on his residency and employment, and (2) an FBI identification record that indicated [Thanh] had been subject to deportation proceedings following an arrest in 1993.

[Petitioner] acknowledges that the fact that [Thanh] was on parole was disclosed to his defense counsel. But [Petitioner]'s original trial counsel stated in his declaration in support of the new trial motion: "I did not conduct any investigation of Thanh [Thanh]'s parole status or his immigration status." And a defense investigator's declaration was to similar effect.

The record, however, sheds no light on why defense counsel did not investigate these matters. (See *Hart, supra,* 20 Cal.4th at pp. 623-624, 632.)

#### *B. Analysis of Defense Counsel's Failure to Investigate*

As mentioned in part I of the Discussion, *ante,* where a claim of ineffective assistance of counsel is made, we will affirm the judgment """"unless counsel was asked for an explanation and failed to provide

17

one, or unless there simply could be no satisfactory explanation . . . ." [Citation.]'" (*Hart, supra,* 20 Cal.4th at pp. 623-624.)

In this case, defense counsel was not asked for an explanation why he failed to investigate [Thanh]'s parole conditions and immigration status, and we can conceive of a satisfactory explanation for this. Thus, we must reject the claim. (*Hart, supra,* 20 Cal.4th at p. 632.)

Put bluntly, this purported evidence of parole conditions and immigration status gets [Petitioner] nowhere. [Petitioner] argues that [Thanh] was virtually certain of returning to prison if he admitted that he was involved in gang-related activity and "likely selected defendant as a fall guy because he had previously known that defendant had been Melinda Vo's boyfriend."

But evidence that [Thanh] feared any involvement in gang-related activities (because of its effect on his parole status) would only explain [Thanh]'s identification of a suspect who was *not* a gang member, not his identification of [Petitioner], whom [Thanh] knew to be a member of a gang known as "Kai Bang."[FN4] [Thanh] would have been better off not identifying anyone as the perpetrator in order to avoid any gang connection to the crime, which he did at first when questioned by officers at the scene.[FN5]

> FN4.   [Thanh] testified that he had heard about a street gang in Stockton named Kai Bang and had previously seen a tattoo of the words "Kai Bang" in big letters on [Petitioner]'s back on one occasion when [Petitioner] took off his shirt when playing basketball with [Thanh]. [Thanh] concluded that [Petitioner] was in the Kai Bang gang based on the tattoo on his back.

> FN5.   This was the trial court's comment in ruling on [Petitioner]'s motion for a new trial.

Indeed, any presentation of evidence that [Thanh] was afraid of going back to prison or of being deported if he were involved in gang activity would have only served to emphasize that [Thanh] had no motive to falsely identify [Petitioner], a gang member.

Nonetheless, [Petitioner] argues on appeal that [Thanh] identified [Petitioner] because he was [Melinda]'s ex-boyfriend, rather than gang-related. [Petitioner] theorizes that [Thanh] changed his story from not identifying anyone at the scene to identifying [Petitioner], because "after he had time to reflect on his own situation, he likely realized that the police [were] certain to recognize a gang shooting for what it was, and would ask Thanh La some very pointed questions as to what he had done to elicit this retaliatory shooting that resulted in the death of Melinda Vo, who appeared to be an essentially innocent bystander."

18

This tortuous theory depends on multilayered speculation concerning the thought processes of [Thanh]. Rather than show why defense counsel was incompetent in failing to investigate [Thanh]'s parole and immigration status, it furnishes a satisfactory explanation why counsel would not have wanted to explore this purported motive for false identification. Presented with evidence that [Thanh] wanted to avoid seeming involvement in gang activity, the jury could more likely have reached the simpler, more straightforward conclusion that [Thanh] would not want to identify a known gang member as the perpetrator unless it was true.

Indeed, [Petitioner]'s theory of impeachment, based on [Thanh]'s parole and immigration status, is so tortured that [Petitioner] is accordingly unable to demonstrate a reasonable probability that the result of this proceeding would have been different had counsel pursued an investigation for evidence that at best could cut either way on the issue of false identification. (*Cudjo, supra*, 20 Cal.4th at p. 687; *Hart, supra,* 20 Cal.4th at p. 624.

In sum, [Petitioner] fails to demonstrate ineffective assistance of counsel based on his trial counsel's failure to investigate, and present evidence concerning, [Petitioner]'s parole and immigration status.[FN6]

> FN6. [Petitioner] also faults his counsel for failing to use a prior inconsistent statement to impeach [Thanh]'s testimony that he first learned that [Melinda] had dated [Petitioner] on the night of the shooting. While defense counsel referred to this testimony in his closing as "a bunch of garbage," he did not impeach [Thanh] with a transcribed interview at the Sheriff's Department that [Thanh] had heard from [Melinda] about her relationship with [Petitioner] a week before. Thus, again, we are called upon to determine if there is a satisfactory explanation for the claimed omission since the record does not indicate why defense counsel failed to do so. (*Hart, supra,* 20 Cal.4th at p. 632; see also *People v. Frierson*, (1979) 25 Cal.3d 142, 158 ["The failure to impeach a witness or to object to evidence are matters which usually involve tactical decisions on counsel's part and seldom establish a counsel's incompetence"].) But counsel could have determined that [Thanh] could explain this minor inconsistency as the product of a memory that had faded over a four-year period from the time of the crime to the time of trial, owing to [Petitioner]'s flight. Accordingly, counsel may have preferred to simply characterize [Thanh]'s testimony as an obvious lie, rather than risking that [Thanh] would emphasize the time that [Petitioner] was in flight. We cannot say that this was not a rational tactical decision. Accordingly, we reject this claim. (*Hart,*

*supra,* 20 Cal.4th at p.632.)

(Lodged Doc. 5 at 16-20).

Once again, the state court's rejection of Petitioner's claim is not contrary to or an unreasonable application of clearly established federal law, nor is it an unreasonable determination of the facts in light of the circumstances.  As discussed above, the decision of the state court must be upheld so long as there is a reasonable argument that "counsel satisfied *Strickland's* deferential standard."  *Harrington,* 131 S.Ct. at 788.  In this case, trial counsel was aware that Thanh was on parole at the time the shooting took place.  The state appellate court pointed out, however, that further investigation of Thanh's parole and immigration status and presentation of that evidence would not necessarily have helped Petitioner's case.  This is because Thanh's interest in  avoiding possible parole revocation and deportation would explain a motive to implicate someone in the shooting who he knew was *not* a gang member.  According to Thanh's trial testimony, he was acquainted with Petitioner for a couple of years prior to the shooting.  Thanh had observed that Petitioner had the words "Kai Bang" tattooed in large letters on his back and Thanh knew Petitioner to be a member of a street gang named "Kai Bang."  In addition, other evidence at trial established that both Petitioner and Thanh were gang members, including testimony by an expert witness that both Petitioner and Thanh were gang members.  Thus, as the state appellate court noted, rather than demonstrating trial counsel's deficient performance, Petitioner's claim that Thanh falsely implicated him in the shooting because he wished to avoid appearing as though he were involved in violent gang activity actually provides support for a reasonable tactical decision by counsel not to pursue this line of investigation because such evidence might have bolstered the credibility of Thanh's identification of Petitioner.  Petitioner has thus failed to demonstrate that the state court's application of the highly deferential standards established by *Strickland* was unreasonable.

Moreover, for the reasons articulated by the state court, Petitioner has failed to establish that there is a reasonable probability that, but for counsel's failure to further investigate Thanh's parole and immigration status, his trial would have resulted in a more favorable outcome.

20

1   Thus, once again, even assuming arguendo that counsel's performance was deficient, Petitioner

2   cannot demonstrate that he has suffered any prejudice as a result.

3              Petitioner is not entitled to federal habeas corpus relief on this claim.

4   **B.    Prosecutorial Misconduct**

5              Petitioner claims that the prosecutor engaged in misconduct by arguing to the jury

6   that Thanh had no motive to falsely incriminate him. Thanh testified at trial that he was on parole

7   at the time of the shooting, however he denied being gang member.  Expert testimony presented to

8   the jury, however, weighed heavily in favor of Thanh's status as a member of the a street gang.

9   Thus, according to Petitioner, the prosecutor had a duty to inform to the jury that [Thanh], who had

10  a hold placed on him by the United States Immigration and Naturalization Service ("INS") as a

11  result of his status as a parolee at the time of the shooting, was motivated to falsely attribute the

12  shooting to a personal vendetta between Petitioner and himself because he wanted to avoid the

13  appearance that he was involved in violent gang activity.  Petitioner contends that if [Thanh]'s

14  parole officer had reason to believe that he was involved in violent gang activity while on parole,

15  he faced the possibility of parole revocation and deportation to Vietnam.  Moreover, Petitioner

16  claims that the prosecution acknowledged that he had such a duty to inform the jury of Thanh's

17  motive to falsely incriminate him in its opposition brief to the motion for a new trial.  The California

18  Court of Appeal, Third Appellate District, considered Petitioner's claim on direct appeal, explaining

19  the background of the claim its reasoning for rejecting the claim as follows:

20              *C.  Purported Prosecutorial Misconduct*

21         Separately, [Petitioner] contends that the prosecutor committed
       "misconduct in denying any motive on [Thanh]'s part to lie in order

22     to avoid parole revocation and deportation." [Petitioner] points to the
       prosecutor's closing argument where the prosecutor argued that there

23     was no evidence, or reason to believe, that [Thanh] had a motive to
       identify [Petitioner] falsely.   [Petitioner] then argues that these

24     statements "cannot be reconciled with the prosecutor's knowledge of
       Thanh La's parole and deportation jeopardy."

25
       Of course, "[t]he prosecutor has a duty, founded on due process, to

26     disclose substantial material evidence favorable to the accused,

                                           21

including those matters relating to the credibility of witnesses and inducements made to secure their testimony." (*People v. Pinholster* (1992) 1 Cal.4th 865, 939-940; *People v. Kasim* (1997) 56 Cal.App.4th 1360, 1380; see § 1054.1, subd. (2).)

But the evidence must be *material*. "Evidence is material in this context 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. [Citation.] Favorable evidence in this context is evidence that 'either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses.''" (*People v. Kasim, supra,* 56 Cal.App.4th at pp. 1379, 1380.)

We have already determined that evidence concerning [Thanh]'s parole or immigration status (which allegations of gang activity would have jeopardized) was more likely to support the truth of [Thanh]'s identification of [Petitioner], a known gang member: [Thanh] would no doubt have preferred not to identify a gang member if it was not true. Therefore, the evidence was not favorable to the defense in that it would not have likely impeached [Thanh].

Accordingly, we conclude that the prosecutor did not commit misconduct by stating that the evidence showed no motive for [Thanh] to falsely identify [Petitioner], when the undisclosed evidence concerning [Thanh]'s parole and immigration status would not have shown otherwise.[FN7]

     FN7.  [Omitted.]

### D. The Prosecution's Claimed Concession

Finally, [Petitioner] claims that the prosecution acknowledged that it had a duty to concede that "[Thanh]'s status as [a] deportee provided [him] with a motive to portray the murder as a personal vendetta," but nonetheless denied [Thanh] had a motive to falsely identify [Petitioner].

It is true that the prosecution made the following statement in its opposition brief to the motion for [a] new trial: "The prosecutor had a duty to acknowledge that Than [*sic*] La's status as [a] deportee provided [Thanh] with a motive to portray the murder as a personal vendetta."

But the prosecution's purported admission looks like a typographical error. We have set out in the margin the full paragraph of the prosecution's opposition, including the heading of the section, which concludes with the sentence on which [Petitioner] relies.FN8 It consists of an explanation why [Thanh]'s immigration status would *not* demonstrate a motive to falsely identify [Petitioner]. It thus

makes no sense that after discounting the impeachment value of this information, the prosecutor would concede that there was a duty to disclose the matter.  Therefore, the only reasonable interpretation of the purported admission in the context of the whole paragraph is that it is a misstatement or typographical error.  As such, it furnishes no support for [Petitioner's] contention of prosecutorial misconduct.

FN8.   **C.  Thanh La's Immigration Status Would Have Added Little Support to the Contention That He Had A Motive To Falsely Accuse Defendant**

The jury knew [that] Thanh La was born in Viet Nam [*sic*] and could have inferred [that] he was not an American citizen.  Whether continued residency in the United States would have been jeopardized by new evidence of violent gang activity is open to question, given that [Thanh] had not been deported following his earlier crimes.  The recent disclosure that [Thanh] periodically traveled to San Francisco to update immigration authorities on his personal information notwithstanding, there is no competent evidence proving that [Thanh] 'was on a very short chain.'  The prosecutor had a duty to acknowledge that than [*sic*] [Thanh]'s status as a deportee provided [him] with a motive to portray the murder as a personal vendetta.

In any event, since evidence of [Thanh]'s immigration status was not exculpatory, the prosecution had no duty to disclose or acknowledge it.

(Lodged Doc. 5 at 20-24).

On habeas corpus review, the narrow standard of due process applies to claims of prosecutorial misconduct.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A prosecutor's error or misconduct does not, per se, violate a criminal defendant's constitutional rights.  *See Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (citing *Darden*, 477 U.S. at 181; *Cambell v. Kincheloe*, 829 F.2d 1453, 1457 (9th Cir. 1987)).  A defendant's due process rights are violated only if the error or misconduct renders the trial fundamentally unfair.  *Darden*, 477 U.S. at 181.

The question to be resolved is whether the alleged misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir. 1991) (quoting *Donnelly v. DeChritoforo*, 416 U.S. 637, 643 (1974)).  In

order to determine whether prosecutorial misconduct occurred, it is necessary to examine the entire proceedings and place the prosecutor's conduct in context. *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987). Factors to be considered in determining whether habeas corpus relief is warranted include whether the prosecutor manipulated or misstated the evidence; whether his comments implicated other specific rights of the accused; whether the objectionable content was invited or provoked by defense counsel's argument; whether the trial court admonished the jurors; and the weight of the evidence against the defendant. *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Relief is limited to cases in which a petitioner can establish that the misconduct resulted in actual prejudice. *Johnson v. Sublett*, 63 F.3d 926, 930 (1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)). In other words, prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict. *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

The state appellate court's rejection of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law. For the reasons set forth by the state appellate court in this subsection, as well as those discussed in subsection (V)(A)(2) for rejecting Petitioner's claim that counsel failed to investigate Thanh's motive for falsely incriminating him, the prosecutor's argument that Thanh had no motive to falsely incriminate Petitioner did not render his trial fundamentally unfair in violation of due process. In fashioning closing, arguments, prosecutors are allowed "reasonably wide latitude," *United States v. Birges*, 723 F.2d 666, 671-72 (9th Cir. 1984), and are free to argue "reasonable inferences from the evidence." *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989). "[Prosecutors] may strike 'hard blows,' based upon testimony and its inferences, although they may not, of course, employ argument which could be fairly characterized as foul or unfair." *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir. 1972).

Moreover, Petitioner has failed to demonstrate prejudice. Petitioner's contention that Thanh falsely accused Petitioner, Melinda's ex-boyfriend, of committing the shooting based on a personal vendetta in order to avoid the appearance that he was involved in violent gang activity

ignores Thanh's testimony that he was aware that Petitioner was a member of the Kai Bang street gang. The state appellate court properly recognized that Petitioner's argument that Thanh falsely identified Petitioner because he wanted to avoid gang affiliation is more persuasive if Thanh had identified someone who he did *not* know to be a gang member. Instead, Thanh, a parolee who faced the possibility of parole revocation and deportation for gang involvement, implicated Petitioner, whom he knew to be a gang member. As the state appellate court discussed, following Petitioner's reasoning, Thanh would likely have preferred to implicate a non-gang member in the shooting, lending more, not less, credibility to Thanh's identification. Moreover, the jury was made aware through Thanh's trial testimony that he was on parole at the time of the shooting and that he denied being a member of a gang. The jury was also presented with expert testimony opining that Thanh was, in fact, a gang member. As discussed in subsection (V)(A)(2), above, Petitioner's trial counsel could reasonably have concluded that presenting the argument Petitioner now advances was not sound trial strategy. Viewed in the context of the trial as a whole, it cannot be determined that the prosecutor's argument had a substantial and injurious effect or influence on the jury's verdict.

Petitioner is not entitled to federal habeas corpus relief on this claim.

## C.    Gang Evidence

Petitioner claims that he was denied his rights to due process and a fair trial by the trial court's erroneous admission of evidence of his alleged gang membership and evidence of an alleged rivalry between a group of gangs with which Petitioner was affiliated and a group of gangs with which Thanh La was affiliated. Accordingly, the prosecutor argued that there was "no dispute that this was a gang shooting." Petitioner argues that the admitted gang evidence was merely speculative, and the probative value of the evidence was outweighed by its prejudicial effect on the jury. The California Court of Appeal, Third Appellate District, considered Petitioner's claim on direct appeal, explaining the background of the claim and its reasoning supporting rejection of the claim as follows:

### A.  Admission of Gang Evidence

25

First, [Petitioner] contends that he "was deprived of due process and a fair trial by the court's erroneous admission of evidence of [his] purported gang membership and [of] a generic 'rivalry' between a group of gangs with which [he] was affiliated and a group of gangs with which Thanh La was affiliated." We find no abuse of discretion in the admission of this evidence and no denial of due process.

1. Background

Granting the prosecution's in limine motion to admit gang evidence, the trial court allowed Sergeant Hatano to testify that [Petitioner] was a Kai Bang [gang] member, based upon, among other things, reports of various contacts between [Petitioner] and Kai Bang members, information from an admitted Kai Bang member that [Petitioner] was a member, and [Petitioner]'s Kai Bang tattoo. (Sergeant Hatano also reviewed an entry in [Melinda]'s diary describing her short (one-month) dating relationship with [Petitioner] some two years before the shooting. The entry on [Petitioner] included the notation "KB . . . (Kai Bang).")

Sergeant Hatano then testified regarding a rivalry between Kai Bang, [Petitioner]'s gang, and Big Time, [Thanh]'s gang. Sergeant Hatano testified that he had received information that two gangs, Big Time and Vietnam, were allies in a rivalry with a group of gangs that included Kai Bang and some seven other gangs. Sergeant Hatano confirmed, however, that he "didn't have any information specific to KB versus BT." But Sergeant Hatano stated that he had personally investigated a member of one of these gangs who killed a member of one of the rival gangs. He concluded that the rivalry was a possible motive for the instant shooting.

Additionally, Sergeant Hatano explained that in gang culture, "the slightest disrespect, the slightest glance, the slightest utterance of a word thought of as disrespectful could lead to violence." When asked if an incident such as that to which [Thanh] testified - - where he told [Petitioner] not to set off firecrackers that were bothering a friend's wife - - could be interpreted as disrespect and trigger violence, Sergeant Hatano agreed that it could.

2. Analysis

We review the trial court's ruling admitting this evidence for abuse of discretion. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1194 (*Carter*); *People v. Champion* (1995) 9 Cal.4th 879, 923.)

"Although evidence of a defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged - - and thus should be carefully scrutinized by trial courts - - such evidence is admissible when relevant to prove identity or motive, if its probative value is not substantially outweighed by its prejudicial effect." (*Carter, supra,* 30

Cal.4th at p. 1194; *People v. Williams*, (1997) 16 Cal.4th 153, 193.)

The evidence here was relevant to both identity and motive. [Thanh]'s and [Petitioner]'s gang membership and the gang rivalry between [Thanh]'s and [Petitioner]'s gang, and their respective allies, was offered by the prosecution to show a motive for [Petitioner] to attack [Thanh] and to support [Thanh]'s identification of [Petitioner]. Evidence of a rivalry between the two gangs also supported [Thanh]'s testimony that when he and [Melinda] saw [Petitioner] in the car following them, [Thanh] ducked down in the hope that [Petitioner] would not see him and let him go. Gang rivalry, and the possibility of a slight that could trigger violent retaliation, also provided a more realistic motive for [Petitioner] to shoot at the car in which [Thanh] rode, rather than the mere fact that [Melinda] had dated [Petitioner] for one month, two years before the shooting. Indeed, this "jealous ex-boyfriend" motive for the shooting was rejected by both the prosecutor and the defense.[FN10]

   FN10.  According to [Petitioner]'s sister, [Petitioner] did not like [Melinda].

Furthermore, the probative value of the evidence was not substantially outweighed by any prejudicial effect.  To the contrary, the prejudice to [Petitioner] from Sergeant Hatano's testimony that he was a gang member was minimal: [Thanh] had already testified that [Petitioner] had a Kai Bang tattoo and was a member of the gang.

[Petitioner], however, disputes the probative value of the evidence. He argues that the trial court erred in admitting "evidence of such a tenuous nature as to the generic rivalry that existed between two groups of gangs.  There was no basis whatsoever to infer that it prompted the shooting in this case, much less that [Petitioner] [as opposed to any of the hundreds of local gang members] was involved."

We disagree.  First, the jury could reasonably infer from the testimony of a rivalry, based on gang alliances, between Kai Bang and Big Time that [Petitioner] - - a Kai Bang member - - had a motive to attack [Thanh] - - even if their gangs were not in direct conflict with each other.  (See *People v. Valdez* (1997) 58 Cal.App 4th 494, 508-509 [admitting expert testimony that seven different "Norteno" gangs had united to attack a group of "Sureno" gangs].)

Second, the gang evidence was probative of motive and bolstered the identity of the perpetrator because the jury could infer from the evidence that a slight display of disrespect by [Thanh] towards [Petitioner] - - i.e., the firecracker incident - - could trigger violence in a gang context.  (See *People Zepeda* (2001) 87 Cal.App.4th 1183, 1207-1208 [admission of expert testimony explaining the gang-related purpose that somebody would go to a location, ask where somebody was from, and then shoot that person]; *People v. Olguin*,

(1994) 31 Cal.App.4th 1355, 1370-1371 [expert testimony on gang psychology admissible].)

Third, in light of the other evidence that supported the conclusion that [Petitioner], not someone else, was involved in the shooting, the gang evidence had the probative value of strengthening that conclusion, not substituting for it.

We conclude that the trial court did not abuse its discretion in admitting expert testimony of gang membership and gang rivalry. There was no denial of due process. (See *People v. Manriquez* (1999) 72 Cal.App.4th 1486, 1492; see also *Carter, supra,* 30 Cal.4th at p.1194.

(Lodged Doc. 5 at 30-34).

To the extent that Petitioner contends that gang evidence should have been excluded pursuant to California state evidentiary law, his claim fails because habeas corpus will not lie to correct errors in the interpretation or application of state law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

With respect to Petitioner's due process claim, the United States Supreme Court has held that habeas corpus relief should be granted where constitutional errors have rendered a trial fundamentally unfair. *Williams v. Taylor*, 529 U.S. 362, 375 (2000). No Supreme Court precedent has made clear, however, that admission of irrelevant or overly prejudicial evidence can constitute a due process violation warranting habeas corpus relief. *See Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) ("The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." (citation omitted)).

Even assuming that improper admission of evidence under some circumstances rises to the level of a due process violation warranting relief under AEDPA, this is not such a case. Petitioner's claim would fail even under Ninth Circuit precedent, pursuant to which an evidentiary ruling renders a trial so fundamentally unfair as to violate due process only if "there are *no*

permissible inferences the jury may draw from the evidence." *Windham v. Merkle*, 163 F.3d 1092, 1102 (9th Cir 1998) (emphasis in original) (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991)).  *See also Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005) ("A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision.").  For the reasons discussed by the state appellate court, there are permissible inferences the jury could have drawn from the gang evidence admitted at trial, for example the existence of a rivalry between Petitioner's gang, Kai Bang, and Thanh's gang, Big Time, and to explain Petitioner's motive for committing the shooting.  Petitioner's trial was not rendered fundamentally unfair in violation of due process based on admission of the gang evidence.

Petitioner is not entitled to federal habeas corpus relief on this claim.

## VI.  CONCLUSION

IT IS RECOMMENDED that Petitioner's petition for writ of habeas corpus be denied.  These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: June 24, 2011

*Charlene H. Sorrentino*

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE